Case No. 13-11893-CC

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT
_____

DR. JEANNIE BLOM,
Plaintiff-Appellant

v.

WELLSTAR HEALTH SYSTEM, INC. and DR. RICHARD HART,
Defendants-Appellants
_____

On Appeal from the United States District Court
for the Northern District of Georgia (Case No. 1:10-CV-00773-JOF)


_____

## INITIAL BRIEF OF APPELLANT
_____


Edward B. Krugman
Georgia Bar No. 429927
Von A. DuBose
Georgia Bar No. 231451
Samika N. Boyd
Georgia Bar No. 194093
**BONDURANT MIXSON & ELMORE, LLP**
3900 One Atlantic Center
1201 West Peachtree Street, N.W.
Atlanta, Georgia  30309-3417
(404) 881-4100

*Counsel for Appellant-Plaintiff*

June 17, 2013

Case No. 13-11893-CC
Dr. Jeannie Blom v. Wellstar Health System, Inc. and Dr. Richard Hart

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

The following trial judges, attorneys, persons, associations of persons, firms, partnerships, and corporations are known to have an interest in the outcome of this case or appeal:

- Baverman, Alan, J., United States Magistrate Judge

- Blews, Scott G., counsel for Appellees

- Blom, Jeannie, Appellant

- Bondurant, Mixson & Elmore, LLP, counsel for Appellant

- Boyd, Samika N., counsel for Appellant

- DuBose, Von A., counsel for Appellant

- Hart, Richard, Appellee

- Forrester, J. Owen, United States District Judge

- Krugman, Edward, counsel for Appellant

- Livesay, Deborah J., counsel for Appellee

- Smith, Sean R., counsel for Appellee

- Taylor English Duma LLP, counsel for Appellees

- Webb, Mary, counsel for Appellant

- WellStar Health Systems, Inc., Appellee

- Whitehead, Steven J., counsel for Appellee

- Zeldin, Lauren H., counsel for Appellees

C1 of 1

## STATEMENT REGARDING ORAL ARGUMENT

Appellant Dr. Jeannie Blom ("Blom") respectfully requests that this case be scheduled for oral argument.  This case involves the factually complex issue of whether each of WellStar Health System ("WellStar")'s proffered reasons for terminating Blom was pretext.  The testimony WellStar witnesses provided in this litigation is largely contradicted by WellStar's own documents.  Blom contends that the district court misapplied the correct standard of review for summary judgment by resolving inconsistencies between WellStar witnesses' testimony and its own documents in WellStar's favor and failing to exercise appropriate inferences with respect to Blom's evidence.  Oral argument will assist this Court in understanding and applying the evidence in this matter's voluminous record to Blom's Title VII discrimination, FMLA retaliation, and quid pro quo sexual harassment claims.

## STATEMENT OF JURISDICTION

Pursuant to 28 U.S.C. § 1291, this Court has jurisdiction over this direct appeal from a final order granting a motion for summary judgment by the District Court of the Northern District of Georgia.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT ........................................................................ C1

STATEMENT REGARDING ORAL ARGUMENT ................................................ i

STATEMENT OF JURISDICTION .......................................................................... ii

TABLE OF CONTENTS ........................................................................................... iii

TABLE OF CITATIONS ........................................................................................... vi

TABLE OF RECORD REFERENCES ................................................................... vii

STATEMENT OF THE ISSUES .............................................................................. 1

STATEMENT OF THE CASE .................................................................................. 3

      I.      COURSE OF PROCEEDINGS ............................................................ 3

      II.     STATEMENT OF FACTS .................................................................... 4

             A.     Blom's Early Employment and Performance at Wellstar .......... 4

             B.     Coding and Compliance Issues Arise in 2006 .......................... 6

                  1.     Blom's Coding Audits and Subsequent Cooperation ....... 6

                  2.     Wellstar's Policy and Procedure Regarding Coding
                       And Compliance ................................................................. 9

             C.     WellStar's Interference with Dr. Blom's FMLA-Protected
                Leave ........................................................................................ 10

             D.     WellStar Concludes That Allegations in a Hotline Complaint
                Against Dr. Blom are "Unfounded" ........................................ 10

             E.     Dr. Blom's Termination .......................................................... 11

III.    STANDARD OF REVIEW ................................................... 14

IV.    SUMMARY OF THE ARGUMENT .................................... 14

ARGUMENT AND CITATION TO AUTHORITY ..................................... 16

    I.    THE DISTRICT COURT ERRED IN GRANTING
       SUMMARY JUDGMENT ON BLOM'S GENDER
       DISCRIMINATION CLAIM .................................................... 16

         A.    Blom Sufficiently Rebutted Each of WellStar's
             Proferred Reasons for Termination ................................ 18

             1.    Harrison and Anderson Were Not Genuinely
                 Concerned About Blom's Coding When She
                 Was Terminated ................................................... 20

                 a.    Blom Did Not Fail Multiple Coding
                     Audits ....................................................... 20

                 b.    WellStar's Documents Clearly Show That
                     Blom was Cooperative and Responsive
                     To WellStar's Coding Experts ................... 26

             2.    Harrison and Anderson Were Not Genuinely
                 Concerned About the Allegations Raised in
                 the Hotline Complaint ........................................... 28

             3.    Anderson Did Not Genuinely Believe That
                 Blom Was a Compliance Risk and Behaved in
                 Ways he Believed Were Inconsistent with
                 What WellStar Expeced From a Medical
                 Doctor ................................................................ 29

         B.    Blom Demonstrated Gender Bias ................................... 32

             1.    Similarly-Situated Physicians .............................. 32

             2.    Hart's Testimony Regarding Gender Bias ........... 33

iv

II.    THE DISTRICT COURT ERRED BY GRANTING
SUMMARY JUDGMENT ON BLOM'S FMLA
RETALIATION CLAIM ........................................................... 35

III.    THE DISTRICT COURT ERRED IN GRANTING
SUMMARY JUDGMENT ON BLOM'S CLAIM FOR
*QUID PRO QUO* SEXUAL HARASSMENT ......................... 36

CONCLUSION ...................................................................................... 38

CERTIFICATE OF COMPLIANCE ...................................................... 40

CERTIFICATE OF SERVICE .............................................................. 41

# TABLE OF CITATIONS

**<u>CASES</u>**                                                                                          **<u>Page</u>**

*Albert-Aluya v. Burlington Coat Factory Warehouse Corp.*, 470 F. App'x 847
(11th Cir. 2012)............................................................................................. 17, 31

*Anderson v. Bessemer City,* 470 U.S. 574, 105 S. Ct. 1504, 84 L. Ed. 2d 518
(1985) ...................................................................................................................19

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)............................................14

*Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227 (11th Cir.
2006) ...................................................................................................................37

*Hinson v. Clinch County, Ga. Bd. of Educ.*, 231 F.3d 821 (11th Cir. 2000)...........17

*Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286 (11th Cir.
2006) ............................................................................................................... 31,35

*Kragor v. Takeda Pharms. Am., Inc.*, 702 F.3d 1304 (11th Cir. 2012)...................17

*Lathem v. Dep't of Children & Youth Servs.*, 172 F.3d 786 (11th Cir. 1999)..........33

*Macuba v. DeBoer*, 193 F.3d 1316 (11th Cir. 1999)................................................35

*Munoz v. Oceanside Resorts, Inc.*, 223 F.3d 1340 (11th Cir. 2000)........................38

*Nichols v. Volunteers of Am., N. Ala., Inc.*, 470 F. App'x 757 (11th Cir. 2012)......14

*Rioux v. City of Atlanta*, 520 F.3d 1269 (11th Cir. 2008)................................. 17, 32

*Rosenfield v. Wellington Leisure Prods.*, Inc., 827 F.2d 1493 (11th Cir. 1987) .....38

*Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311 (11th Cir. 1989) ...................33

*Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994 (11th Cir. 1992)........................14

*Walls v. Button Gwinnett Bancorp, Inc.* 1 F.3d 1198 (11th Cir. 1993)...................19

*Zapata-Matos v. Reckitt & Colman, Inc.*, 277 F.3d 40 (1st Cir. P.R. 2002) ..... 19-20

**Statutes**

28 U.S.C. § 1291 ...................................................................................................... ii

**Rules**

Fed. R. Civ. P. 56(c) ..............................................................................................14

# TABLE OF RECORD REFERENCES

| DOCKET / TAB # | DESCRIPTION | PAGE # |
|---|---|---|
| 1 | Complaint | 3 |
| 94-7 | Exhibit E Part 1 to Defendants' Notice of Filing Original Discovery | 22 |
| 94-10 | Exhibit F Part 1 to Defendants' Notice of Filing Original Discovery | 9, 14, 21, 27, 30, 32, 36 |
| 94-24 | Exhibit I to Defendants' Notice of Filing Original Discovery | 8, 27 |
| 94-25 | Exhibit J to Defendants' Notice of Filing Original Discovery | 6, 12, 34, 37 |
| 94-33 | Exhibit P to Defendants' Notice of Filing Original Discovery | 9, 23- 25, 27 |
| 95 | Defendant Dr. Richard Hart's Motion for Summary Judgment | 3 |
| 96 | Defendant WellStar Health System, Inc.'s Motion for Summary Judgment | 3 |
| 105 | Plaintiff Dr. Jeannie Blom's Brief in Opposition to Defendant WellStar's Motion for Summary Judgment | 3 |
| 105-1 | Exhibit 1 to Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment | 4-6, 11-13, 19, 26, 29, 33-38 |
| 105-2 | Exhibit 2 to Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment | 5, 31 |

| DOCKET / TAB # | DESCRIPTION | PAGE # |
|---|---|---|
| 105-3 | Exhibit 3 to Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment | 5, 31 |
| 105-5 | Exhibit 5 to Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment | 13 |
| 105-6 | Exhibit 6 to Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment | 13 |
| 105-7 | Exhibit 7 to Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment | 8, 36 |
| 105-8 | Exhibit 8 to Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment | 5 |
| 105-9 | Exhibit 9 to Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment | 13-14, 19, 34, 36 |
| 105-11 | Exhibit 11 to Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment | 6, 12, 34 |
| 105-15 | Exhibit 15 to Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment | 6-7, 9, 23-24, 26-27 |
| 105-17 | Exhibit 17 to Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment | 6, 9 |
| 105-18 | Exhibit 18 to Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment | 6-7, 9 |
| 105-19 | Exhibit 19 to Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment | 6-7, 9, 27 |
| 105-20 | Exhibit 20 to Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment | 7, 20, 22 |

| DOCKET / TAB # | DESCRIPTION | PAGE # |
|---|---|---|
| 105-21 | Exhibit 21 to Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment | 7, 26-27 |
| 105-23 | Exhibit 23 to Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment | 7-8, 22-23, 26-27, 30, 36 |
| 105-24 | Exhibit 24 to Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment | 8, 21-23, 27 |
| 105-25 | Exhibit 25 to Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment | 8, 21-22 |
| 105-26 | Exhibit 26 to Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment | 10 |
| 105-27 | Exhibit 27 to Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment | 10, 35 |
| 105-28 | Exhibit 28 to Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment | 10, 35 |
| 105-29 | Exhibit 29 to Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment | 10, 35 |
| 105-30 | Exhibit 30 to Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment | 10, 35 |
| 105-31 | Exhibit 31 to Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment | 10, 35 |
| 105-32 | Exhibit 32 to Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment | 11, 13 |
| 105-33 | Exhibit 33 to Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment | 11-12, 28-29 |

| DOCKET / TAB # | DESCRIPTION | PAGE # |
|---|---|---|
| 105-34 | Exhibit 34 to Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment | 11-12, 19, 28-29, 34 |
| 105-38 | Exhibit 38 to Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment | 9-10, 13, 21-22, 32-33 |
| 105-39 | Exhibit 39 to Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment | 13, 21-22, 24, 33 |
| 105-40 | Exhibit 40 to Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment | 6, 20, 33 |
| 117 | Reply Brief in Support of Defendant WellStar Health System, Inc.'s Motion for Summary Judgment | 3 |
| 123 | United States Magistrate Judge's Final Report and Recommendation | 3, 16, 28-29, 33 |
| 125 | Joint Motion for Extension of the Deadlines to File Objections to the Final Report and Recommendation of the United States Magistrate Judge and Responses to Those Objections | 4 |
| 126 | Plaintiff's Objections to the Final Report and Recommendation of the United States Magistrate Judge | 4 |
| 127 | Defendant WellStar Health System's Response to Plaintiff's Objections to the Final Report and Recommendation of the United States Magistrate Judge | 4 |
| 128 | Order | 4, 16, 18-19, 22-23, 26, 28, 30, 32-33, 37 |

| DOCKET / TAB # | DESCRIPTION | PAGE # |
|---|---|---|
| 129 | Judgment | 4 |

## STATEMENT OF ISSUES

1.     Whether the district court erred in granting summary judgment on

Blom's gender discrimination claim when a reasonable juror could

find that WellStar's belated explanations for terminating Blom were

pretextual where there is no documentary evidence contemporaneous

with Blom's termination that contains any reference to WellStar's

purported reasons for terminating her and there are numerous

contradictions between WellStar's documents and its witnesses'

deposition testimony taken during the course of litigation.

2.     Whether the district court erred in granting summary judgment on

Blom's Family Medical Leave Act ("FMLA") retaliation claim when

close temporal proximity existed between Blom's final complaint and

termination, together  with Blom's repeated complaints prior to the

final one, WellStar's deviation from its usual practice of deferring to

its coding experts for coding and compliance issues, and the lack of

documents contemporaneous with Blom's termination referencing any

of WellStar's purported reasons for terminating her.

3.     Whether the district court erred in granting summary judgment on

Blom's *quid pro quo* sexual harassment claim when close temporal

proximity existed between her termination and Hart's offer to protect Blom from termination in exchange for sex and, in the alternative, when Blom reasonably believed that Hart had the ability to influence her employment conditions.

## STATEMENT OF THE CASE

## I.    COURSE OF PROCEEDINGS

On March 16, 2010, Blom filed suit against Dr. Richard Hart ("Hart") and

Appellee WellStar, alleging, *inter alia*, gender discrimination under Title VII of

the Civil Rights Act of 1964 ("Title VII"), retaliation in violation of the Family

Medical Leave Act ("FMLA"), and *quid pro quo* sexual harassment.[1]  On June 18,

2012, Hart and WellStar separately moved for summary judgment.[2]  Blom

responded to WellStar's Motion for Summary Judgment on August 6, 2012,[3] and

WellStar filed a reply brief on August 17, 2012.[4]

On February 19, 2013, Magistrate Judge Alan J. Baverman issued a Report

and Recommendation (hereinafter the "Report") regarding the disposition of Dr.

Hart's Motion for Summary Judgment and WellStar's Motion for Summary

Judgment.[5]  In his Report, Magistrate Judge Baverman recommended that the

district court grant both motions for summary judgment.[6]  Because of the complex

nature of the case, and the multiple claims at issue, the Parties jointly requested a

---

[1] Dkt. No. 1.
[2] Dkt. Nos. 95, 96.
[3] In light of the facts revealed during the discovery period regarding Hart's use of his position at WellStar to affect the terms and conditions of Blom's employment, Blom did not oppose Hart's Motion for Summary Judgment.
[4] Dkt. Nos. 105, 117.
[5] Dkt. No. 123.
[6] *Id.* at 78.

1103061.1

14-day extension of the deadlines to file objections.[7]  Judge Forrester granted only

a three-day extension.[8]  Blom filed her objections to the Report on March 8, 2013,[9]

and WellStar responded to those objections on March 25, 2013.[10]  Three days later,

the district court adopted the Report and granted both motions for summary

judgment.[11]  On March 29, 2013, the Clerk of Court entered a Judgment in favor of

Hart and WellStar.[12]

On April 25, 2013, Blom timely filed her Notice of Appeal. [13]

## II.    STATEMENT OF FACTS

### A.    *Blom's Early Employment and Performance at WellStar.*

Blom, who graduated from medical school at the age of 23, is a double

board-certified physician with specialties in rehabilitation and regenerative

medicine.[14]  In June 2000, she joined WellStar as a rehabilitation specialist and

rose to the level of Medical Director at WellStar's Cobb Hospital Rehabilitation

---

[7] Dkt. No. 125.

[8] Minute Order of 2/27/2013.

[9] Dkt. No. 126.

[10] Dkt. No. 127.

[11] Dkt. No. 128 at 24.

[12] Dkt. No. 129.

[13] While the district court also granted Hart's Motion for Summary Judgment and WellStar's Motion for Summary Judgment as to Blom's claims of Title VII retaliation, FMLA interference, negligent retention, and breach of contract, those causes of action are not at issue on appeal.

[14] Dkt. No. 105-1 at ¶¶ 2, 3.

Unit (the "Rehab Unit").[15]  Hart, the former Medical Director of the Physician's Group, served as her immediate supervisor.[16]  During her tenure at WellStar, Blom consistently ranked as one of the top five earners in WellStar's system, and was the only woman on this highly coveted list.[17]  Blom's earnings were based on the revenue she generated by successfully obtaining referrals to the Rehab Unit for patients through her reputation for excellent care and patient advocacy.[18]

During Blom's early years of employment at WellStar, Hart often assisted her with work-related issues and did so through frequent lunch meetings.[19]  Hart represented to Blom that he was looking out for her best interest at WellStar and was protecting her from those who sought to do harm to her career.[20]  He told her that she would experience difficulties at WellStar without his protection.[21]  Blom began to trust Hart not only as her supervisor but also as a confidant.[22]

Their platonic relationship eventually became intimate in 2002.[23]  About two years later, Hart no longer supervised Blom after assuming a new position within

---

[15] See Dkt. Nos. 105-2, 105-3.

[16] *See* Dkt. No. 105-1 at ¶ 12.

[17] *See* Dkt. No. 105-8.

[18] *See* Dkt. No. 105-1 at ¶¶ 8-10.

[19] *Id.* at ¶ 13.

[20] *Id.* at ¶¶ 15-16.

[21] *Id.* at ¶ 30.

[22] *Id.* at ¶ 18.

[23] Id. at ¶ 29.

WellStar, [24] but they were still intimate. [25]  In 2006, Blom ended the intimate relationship with Hart. [26]

### B.    Coding and Compliance Issues Arise in 2006.

#### 1.    Blom's Coding Audits and Subsequent Cooperation.

As long as Blom and Hart had an intimate relationship, Blom had never undergone a coding and compliance audit by WellStar. [27]  Shortly after that relationship ended, however, Blom failed her first coding and compliance audit [28] in April of 2006. [29]  Blom thereafter worked diligently with Kimberly Heibel, WellStar's Manager for Professional Services Coding Assurance, Kim Walker, an Education Coordinator in Coding Assurance, and the Compliance Department to improve her accuracy score. [30]  Blom took tangible steps to ensure that she documented and coded accurately. [31]  Those steps included faxing her daily notes to Heibel's team [32] and asking multiple follow-up questions in an effort to get

---

[24] Dkt. No. 94-25 at 12, 45 (dep. pgs. 33, 163-65).

[25] *See* Dkt. No. 105-11 at 14 (dep. pg. 296).

[26] *Id.* at 20 (dep. pg. 311).

[27] Dkt. No. 105-1 at ¶ 39.

[28] Coding and compliance audits are conducted periodically by WellStar's Compliance Department.  During these audits, physicians' coding is reviewed for the purpose of compliance with internal and external (e.g. Medicare standards.

[29] *See* Dkt. No. 105-40; *see also* Dkt. No. 105-1 at ¶ 39.

[30] *See e.g.*, Dkt. No. 105-15.

[31] *See* Dkt. No. 105-17, 105-18, 105-19.

[32] Dkt. No. 105-17.

feedback.[33]  Blom even arranged for Heibel to have computer access to her

consults.[34]

Heibel was extremely complementary of Blom and her cooperativeness

during this process.[35]  After Heibel observed one of Blom's team conferences, she

exclaimed, "She never ceases to amaze me."[36]  Heibel further stated that watching

Blom's team conference "was a very good experience and she [Blom] is genuinely

appreciative."[37]  Blom adopted many of Heibel's suggestions, and her March 2007

re-audit improved to an 83% accuracy rate.[38]

Even after this significant improvement, Blom continued to work with

Heibel who admitted that Blom "is very friendly and wants me to have access to

what ever I need."[39]  Heibel also confirmed that Blom "has been very receptive to

all of our observations and suggestions for improvement."[40]  She further indicated

that she did "not foresee [Blom] failing [re-audit] if she continues to focus on the

areas we worked on most recently."[41]  Blom passed her next coding audit with a

---

[33] *See e.g.,* Dkt. No. 105-19.
[34] Dkt. No. 105-18.
[35] Dkt. No. 105-15.
[36] *Id.*
[37] *Id.*
[38] Dkt. No. 105-20.
[39] *See* Dkt. No. 105-21.
[40] Dkt. No. 105-23.
[41] *Id.*

96% accuracy rate, which was her last audit prior to her termination.[42]  Heibel

reported these excellent results to Donald Campbell, the Senior Vice-President for

Physician Leadership, and copied Bruce Harrison, the Senior Vice-President of

Physician Services.[43]  While Campbell responded, "[t]his is a great report,"[44]

Harrison did not respond in writing.  And contrary to this substantial evidence of

Blom's cooperation and significant progress in improving her coding scores,

during this litigation, Harrison incredibly claimed that Blom "would not respond

favorably to the advice or the coaching of the people on the team."[45]

　　　After working with Blom, Heibel recommended that WellStar convene an

external peer review[46] of Blom if David Anderson, WellStar's Chief Compliance

Officer, had any additional concerns regarding Blom's coding.[47]  However,

WellStar ignored Heibel's recommendation and never implemented an external

peer review.[48]

---

[42] Dkt. No. 105-24.

[43] Dkt. No. 105-23.

[44] Dkt. No. 105-25.

[45] Dkt. No. 94-24 at 23 (dep. pg. 76).

[46] As Heibel's email implies, a peer review involves review of medical practice issues relative to a particular physician by a panel of other physicians.

[47] Dkt. No. 105-23.

[48] Dkt. No. 105-7 at 4-6 (dep. pgs. 219-221).

###### 2.    *WellStar's Policy and Procedure Regarding Coding and Compliance.*

Anderson stipulated that he was not an expert on coding[49] and followed the advice of his "coding experts" on coding and compliance issues.[50]  He had minimal, if any, communication with Blom regarding her coding audits or her subsequent cooperation to address the coding and compliance issues identified by those audits.[51]  On summary judgment, WellStar introduced virtually all of its substantive evidence regarding coding and compliance through Heibel.[52]  Indeed, it was Heibel, not Anderson, who was Blom's main contact regarding the audits of her coding and subsequent coaching.[53]

Although Anderson conceded that he lacked expertise as to coding and compliance issues, he nonetheless testified that Blom was terminated in part because she was always on a list of noncompliant physicians.[54]  He also claimed in his deposition that "every quarterly meeting I attended until her discharge included an agenda item related to her coding above national benchmarks,"[55] but later retreated from that position after being shown the agendas from those meetings that did not mention Blom:  "Didn't mean it necessarily had to be a written agenda

---

[49] Dkt. No. 94-10 at 19 (dep. pg. 69); Dkt. No. 105-38 at 7 (dep. pg. 27).

[50] Dkt. No. 94-10 at 17-19, 22-23, (dep. pgs. 60-61, 64-65, 67-68, 81-82).

[51] *See e.g.,* Dkt. Nos. 105-15 at 3, 105-17 at 2, 105-18 at 2, 105-19 at 2.

[52] Dkt. No. 94-33.

[53] *See e.g.*, Dkt. Nos. 105-17, 105-18, 105-19.

[54] Dkt. No. 94-10 at 19 (dep. pg. 66).

[55] *Id.* at 18 (dep. pg. 65).

item.  It was discussed at every meeting that I attended."[56]

###   C.    WellStar's Interference with Dr. Blom's FMLA-Protected Leave.

At the end of 2007 and the beginning of 2008, Blom was the primary care giver for several ill family members, and she intermittently needed to be away from the Rehab Unit to care for them.[57]  Although WellStar was aware of Blom's situation, it refused to provide appropriate coverage and, in fact, began to interfere with Blom's efforts to care for her ill family members.[58]  Beginning in February 2008, Blom complained, in writing, to Campbell and Anderson about the interference with her leave.[59]  As the coverage problems persisted and Blom's need to be with her family to care for them continued, she repeatedly informed Harrison, the decision maker in her termination, of these issues, on March 6, March 7, and March 18.[60]  Blom was even required to handle patient issues while at her father's bedside because of WellStar's failure to provide proper coverage for the Rehab Unit.[61]

###   D.    WellStar Concludes That Allegations in a Hotline Complaint Against Dr. Blom are "Unfounded."

On February 7, 2008, an anonymous individual contacted WellStar's compliance hotline phone number and made several allegations of misconduct

---

[56] Dkt. No. 105-38 at 4-5 (dep. pgs. 17-18).
[57] Dkt. Nos. 105-26, 105-27, 105-28.
[58] See id.; see also Dkt. Nos. 105-29, 105-30, 105-31.
[59] Dkt. Nos. 105-27, 105-28.
[60] See Dkt. Nos. 105-29, 105-30, 105-31.
[61] See e.g., Dkt. Nos. 105-28, 105-30.

about Blom that ranged from improper billing to falsifying documents.[62]  Shortly

after the call came in, WellStar conducted an investigation regarding the

allegations.[63]  During this process, WellStar interviewed the Rehab Unit staff

members.[64]  WellStar ultimately concluded that the anonymous hotline caller's

allegations were "unfounded."[65]  During discovery WellStar failed to produce this

report until after the discovery deadline had passed.  Blom was allowed to question

many of WellStar's witnesses on this report, but was denied permission to address

the report with Harrison, one of the decision makers in this case.

### E.    Dr. Blom's Termination.

On February 29, 2008, Harrison sent Blom a letter enclosing draft copies of

a new employment agreement.[66]  The letter specifically mentioned the issues raised

by the anonymous hotline caller and reminded Blom of some of her obligations

under WellStar policies as they relate to the particular allegations levied in the

hotline complaint.[67]  Harrison's letter further requested that Blom execute a new

employment agreement that was enclosed.[68]  Harrison's letter also stated that the

hotline complaint investigation was still ongoing, but WellStar had already

completed its investigation and generated a report, detailing its findings to

---

[62] Dkt. No. 105-32.
[63] Dkt. No. 105-33.
[64] *Id.*
[65] Dkt. No. 105-32; Dkt. No. 105-1 ¶¶ 46-48.
[66] Dkt. No. 105-34.
[67] *Id.* at 2-3.
[68] *Id.* at 3.

WellStar executives.[69]  Finally, Harrison's letter noted that if any additional

concerns arose from the investigation, WellStar would address them with her at a

later time.[70]  Dr. Blom was never informed that any additional concerns had

arisen.[71]

On March 5, 2008, Hart contacted Blom.[72]  He was no longer her supervisor

at the time,[73] and she had not communicated with him since she ended their

relationship in 2006.[74]  Hart told her that there was a plan to terminate her[75] and

that she was being targeted by WellStar because of her gender.[76]  After relaying

that information, which clearly demonstrated that he had knowledge of her current

troubles, Hart stated that if they could "get[] together," he could help her.[77]

During the previous intimate relationship, Hart used the phrase "get together"

when he wanted to come to Blom's home and engage in sex.[78]  Blom declined

Hart's offer.[79]  Hart called Blom back on March 6, 2008, and gave her more

information, implied that she faced big trouble, and once again suggested again

---

[69] Dkt. No. 105-33.
[70] Dkt. No. 105-34 at 2-3.
[71] Dkt. No. 105-1 ¶¶ 46-48.
[72] *Id.* at ¶¶ 41-42.
[73] Dkt. No. 94-25 at 12, 45 (dep. pgs. 33, 163-65).
[74] Dkt. No. 105-11 at 24 (dep. pg. 321).
[75] Dkt. No. 105-1 ¶¶ 42, 49.
[76] Dkt. No. 105-11 at 22, 23-28 (dep. pgs. 316, 320-25); Dkt. No. 105-1 at ¶¶ 41-42.
[77] Dkt. No. 105-1 at ¶ 43.
[78] *Id.* at ¶ 44.
[79] *Id.* at ¶ 45.

that they "get together."[80]  Hart apparently knew that Blom was experiencing

difficulties at WellStar and Blom believed that he could help her, but was

unwilling to receive his help in return for sex.[81]

    Despite the personal and professional challenges, Blom continued to excel in

the months leading up to her termination.[82]  As recent as January and February

2008, she received 97% and 98% customer satisfaction survey results,

respectively.[83]  For the month of March 2008, Blom's Rehab Unit scored a 96%

satisfaction rating on a patient survey, which included the following feedback:

"Dr. Blom is a blessing[;] she has the bedside manners of a saint" and "[w]e love

Dr. Blom."[84]  Nonetheless, WellStar terminated her in March 2008,[85] but retained

several male physicians who had previously failed coding audits and subsequent

re-audits.[86] Blom was called to Harrison's office where she thought they would

discuss her new employment contract.[87]  Instead, Anderson and Harrison told her

that, although the allegations in the compliance hotline complaint were

"unfounded,"[88] she was being terminated "without cause."[89]

---

[80] *Id.* at ¶ 44.
[81] *Id.* at ¶ 45.
[82] Dkt. Nos. 105-5, 105-6.
[83] Dkt. No. 105-6.
[84] Dkt. No. 105-5.
[85] Dkt. No. 105-9; Dkt. No. 105-1 ¶ 48.
[86] Dkt. No. 105-38 at 16-18 (dep. pgs. 47-49); Dkt. No. 105-39.
[87] Dkt. Nos. 105-9, 105-1 ¶¶ 46-48.
[88] Dkt. No. 105-32; Dkt. No. 105-1¶¶ 46.

## III.    STANDARD OF REVIEW

This Court reviews the district court's grant of summary judgment *de novo*. During its review, this Court applies the same legal standards from below:  View the evidence in the light most favorable to the non-moving party to determine whether a genuine issue of material fact exists to preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513-14 (1986).  Weighing of evidence and making credibility determinations are impermissible.  *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992).  If the record demonstrates that there is a genuine issue of material fact or that the Defendant is not entitled to judgment as a matter of law, this Court cannot affirm the district court's grant of summary judgment.  Fed. R. Civ. P. 56(c).

Further, this Court reviews a district court's ruling on the admissibility of evidence for abuse of discretion.  *See Nichols v. Volunteers of Am., N. Ala., Inc.*, 470 F. App'x 757, 761 (11th Cir. 2012).  The exclusion of an affidavit is to be applied "sparingly because of the harsh effect it may have on a party's case." *Id.* (citation omitted).

## IV.    SUMMARY OF THE ARGUMENT

The district court erred in granting summary judgment on Blom's Title VII gender discrimination claim.  To reach this decision, the court incorrectly

---

[89] Dkt. No. 105-9; *see also* Dkt. No. 94-10 at 14 (dep. pg. 46).

concluded that Blom did not sufficiently rebut each of WellStar's proffered reasons for her termination.  WellStar's own documents clearly show that it was not genuinely concerned about Blom's coding at the time of her termination, the allegations in the hotline complaint, that she was a purported compliance risk or that Blom supposedly behaved in ways inconsistent with her duties as Medical Director of the Rehab Unit.  Instead of concluding that Blom successfully rebutted WellStar's ad hoc explanations for her termination, the district court improperly resolved contradictions between WellStar witnesses' testimony and its own documents in WellStar's favor.  There is also sufficient evidence that gender bias motivated WellStar's decision to terminate Blom.  The record reflects that WellStar treated similarly-situated male comparators differently and Hart, who was still a WellStar employee and acting under long-standing apparent authority told Blom that she was being targeted because of her gender.

The district court also erred in granting summary judgment on Blom's FMLA retaliation claim.  Blom did not rely on close temporal proximity alone to establish causation.  The record contains ample evidence from which a reasonable juror could find that there is a casual connection between Blom's protected activity and her termination.  She made numerous complaints regarding WellStar's interference with her FMLA leave during the same time frame.  Most notably, WellStar deviated from its usual practice of deferring to its coding experts on

15

coding and compliance issues when purportedly terminating Blom for being a

compliance risk, and the record is practically devoid of contemporaneously created

WellStar documents that support the version of events advanced by its witnesses in

this litigation.

Finally, the district court erred in granting summary judgment on Blom's

*quid pro quo* sexual harassment claim.  The court overlooked an alternative means

by which a plaintiff may establish causation.  The record unequivocally reflects a

very close temporal proximity between Blom's termination and Hart's offer to

protect her from termination in exchange for sex.  In addition, a genuine issue of

material fact exists as to whether Hart had the ability to influence Blom's

termination, which stems from the conflicting testimony of Blom and WellStar's

witnesses.

<u>**ARGUMENT AND CITATION TO AUTHORITY**</u>

**I.    THE DISTRICT COURT ERRED IN GRANTING SUMMARY
       JUDGMENT ON BLOM'S GENDER DISCRIMINATION CLAIM.**

It is undisputed that Blom established a *prima facie case* of gender

discrimination under Title VII.[90]  Once WellStar met its burden to provide a

legitimate, non-discriminatory reason for Blom's termination, the burden shifted to

Blom to rebut each of WellStar's proffered reasons for termination.[91]  Blom's

---

[90] Dkt. No. 123 at 24; Dkt. No. 128 at 11.

[91] Dkt. No. 123 at 26.

16

burden on pretext at the summary judgment stage was to demonstrate a genuine

issue of material fact as to whether *each* of Defendant's articulated reasons is

pretextual. *See Hinson v. Clinch County, Ga. Bd. of Educ.*, 231 F.3d 821, 830

(11th Cir. 2000). A plaintiff may demonstrate that an employer's proffered

reasons are pretextual by revealing "such weaknesses, implausibilities,

inconsistencies, incoherencies, or contradictions in the employer's proffered

legitimate reasons for its action that a reasonable factfinder could find them

unworthy of credence." *Albert-Aluya v. Burlington Coat Factory Warehouse

Corp.*, 470 F. App'x 847, 851 (11th Cir. 2012) (citation omitted). To meet its

burden, the plaintiff has to produce evidence sufficient to enable a reasonable juror

to conclude that the employer's proffered reason(s) for termination were not the

real reason for the termination. *See Kragor v. Takeda Pharms. Am., Inc.*, 702 F.3d

1304, 1309 (11th Cir. 2012). Moreover, "[w]hen a plaintiff chooses to attack the

veracity of the employer's proffered reason, the inquiry is limited to whether the

employer gave an honest explanation of its behavior." *Id.* at 1310-11 (internal

marks and citation omitted). A plaintiff may also meet its burden by identifying a

valid comparator. *See Rioux v. City of Atlanta*, 520 F.3d 1269, 1280 (11th Cir.

2008) (internal marks and citation omitted). As shown below, Blom satisfied both

tests for establishing pretext at the summary judgment stage.

17

A.    **Blom Sufficiently Rebutted Each of WellStar's Proffered Reasons for Termination.**

As detailed by the district court, WellStar's proffered reasons for

Blom's termination were:

> (1) Plaintiff's coding and compliance had been a matter of concern;
>
> (2) an anonymous hotline complaint alleged Plaintiff had been engaged in coding fraud, although WellStar's investigation found the fraud allegations were not substantiated, other issues with Plaintiff's work practices had been raised; and
>
> (3) Anderson determined that Plaintiff was a compliance risk and behaved in ways he believed were inconsistent with what WellStar expected from a medical director.[92]

To place the district court's decision in context, an overarching issue bears

mention prior to addressing each of WellStar's proffered reasons for termination.

There is a common denominator for each of those reasons - the chasm between

WellStar witnesses' testimony during this case and the undisputed facts as detailed

by WellStar's contemporaneously created internal documents.  WellStar's

documents paint a very different picture of what actually occurred, which, viewing

the evidence in a manner most favorable to the non-movant, compelled denial of

WellStar's motion on Blom's Title VII gender discrimination claim.

The district court concluded that the fact that Blom was terminated "without

cause," per her employment contract, was a function of the language of her

---

[92] Dkt. No. 128 at 11.

Agreement and not a reflection of what Harrison and Anderson believed about her employment.[93]  While the court is correct about what the contract said, that does not insulate WellStar from liability for gender discrimination.  Otherwise, a discriminatory employer could avoid liability under Title VII by simply reciting the language in a contract allowing for termination without cause.  What is important is that Blom was *never* given the reasons for termination prior to her assertion of claims for improper termination.[94]  Only then did WellStar try to justify the termination.[95]  Of course, WellStar's failure to reveal its proffered reasons prior to litigation alone is of little legal consequence, but when one considers that, as stated above, *virtually all* of WellStar's own documents contradict its witnesses' testimony in this case, there can be no doubt that Blom has identified issues of fact for a jury to decide.  *See Anderson v. Bessemer City*, 470 U.S. 574, 575, 105 S. Ct. 1504 (1985) (noting that a federal circuit court may find clear error where documents or objective evidence contradict testimony); *Walls v. Button Gwinnett Bancorp, Inc*. 1 F.3d 1198, 1200-1201 (11th Cir. 1993) (reversing the district court's grant of motion for judgment as a matter of law because the court weighed evidence and made credibility determinations as to some testimony and evidence that conflicted); *see also Zapata-Matos v. Reckitt & Colman, Inc.*,

---

[93] *Id.* at 16.
[94] Dkt. No. 105-9; Dkt. No. 105-1 at ¶¶ 46-48.
[95] Dkt. No. 105-34 at 2-3.

277 F.3d 40, 47 (1st Cir. 2002) (sufficient evidence of pretext found where "the reasons given at termination and in contemporaneous documents appeared to be inconsistent with defendant's answer to the complaint and with deposition testimony."). In the case *sub judice*, the district court summarily resolved these contradictions in WellStar's favor, often without citation to record evidence. The "weaknesses, implausibilities, inconsistencies, incoherencies or contradictions" in WellStar's proffered reasons for Dr. Blom's termination are addressed in turn below.

> 1. *Harrison and Anderson Were Not Genuinely Concerned About Blom's Coding When She Was Terminated.*

On the issue of coding concerns, the district court cited to various portions of each party's position, clearly demonstrating factual tension between the testimony of WellStar's witnesses and its own documents, but summarily resolved those factual disputes in WellStar's favor.

> a) *Blom Did Not Fail Multiple Coding Audits.*

WellStar's documents on this are simple and indisputable. Blom failed her first coding audit in April of 2006.[96] Blom improved to 83% accuracy for her March 2007 re-audit.[97] Blom passed her November 2007 re-audit with a score of

---

[96] *See* Dkt. No. 105-40.
[97] Dkt. No. 105-20.

96%.[98]  Campbell acknowledged that Blom's last re-audit was a "great report."[99]

Moreover, WellStar's own list that shows which physicians failed re-audits during

the subject time period does not include Blom.[100]

Ignoring its own documents, WellStar has taken the position that it somehow

"genuinely" believed that Blom's coding was of concern and a proper basis for its

decision to terminate her employment.  Anderson testified that he concluded that

Blom was a compliance risk based, in part, on the fact that her coding was

supposedly a constant agenda item at quarterly compliance meetings in 2006 and

2007.[101]  But when Anderson was confronted with the agenda for each meeting at a

subsequent deposition, he suddenly changed course, testifying that he "[d]idn't

mean it necessarily had to be a written agenda item.  It was discussed at every

meeting that I attended."[102]  Anderson also testified that Blom was the only

physician who was continually on the failed re-audit list that was circulated at the

subject compliance meetings.[103]  That testimony is directly contradicted by

WellStar's documents which show that Blom never failed a re-audit after her initial

---

[98] Dkt. No. 105-24.
[99] Dkt. No. 105-25.
[100] Dkt. No. 105-39.
[101] Dkt. No. 94-10 at 18 (dep. pg. 65).
[102] Dkt. No. 105-38 at 4-5 (dep. pgs. 17-18).
[103] Dkt. No. 105-38 at 4-5, 8-9 (dep. pgs. 17-18, 36-37).

failed audit in 2006[104]– she improved to 83% for the second re-audit in March 2007[105] and passed her last re-audit in November of 2007 with a score of 96%.[106]

During his deposition, Anderson could not explain the contradiction between WellStar's purported coding concerns and its internal documents.   Indeed, Anderson testified during his second deposition that Blom failed more than two coding re-audits,[107] but when confronted with WellStar's documents that contradicted his testimony, he was unable to explain the disparity.[108]   Faced with the obvious disparity between WellStar's documents and testimony in this case, the district court concluded that "[t]he fact that Plaintiff did improve her coding accuracy does not change where she fell on national benchmarks."[109]   Not only does this conclusion ignore the fact that Blom completed her last audit with a score of 96%,[110] it disregards Campbell's email regarding Blom's last re-audit that "this is a great report."[111]   Harrison was copied on that email, but failed to dispute it.[112] The district court's faulty conclusion was seemingly based upon an assumption it

---

[104] Dkt. No. 105-39.
[105] Dkt. No. 105-20.
[106] Dkt. No. 105-24.
[107] Dkt. No. 105-38 at 11-17 (dep. pgs. 42-48).
[108] Dkt. No. 94-7 at 14-15 (dep. pgs. 49-53).
[109] Dkt. No. 128 at 17; As Heibel's email, Dkt. No. 105-23, implies, "national benchmarks" is the national norm for a physician's use of coding to bill one's patients for services rendered by that physician.
[110] Dkt. No. 105-24.
[111] Dkt. No. 105-25 at 2.
[112] *Id.*

22

made regarding its understanding of medical coding and national benchmarks, with no citation to the record and with no support from any argument or evidence submitted by the parties.[113]

WellStar attempted to smooth over Anderson's inconsistent testimony by submitting Heibel's Declaration in support of its Motion for Summary Judgment,[114] but her declaration is fatally flawed in several ways.  First, Heibel's declaration does not state that she or anyone else in WellStar's Compliance Department advised Anderson that Blom was a compliance risk.[115]  Second, Heibel's allegation that Blom used "cloned entries" is belied by the score Blom received on her final re-audit.[116]  Again, Blom scored a 96% in her last re-audit in September of 2007.[117]  Heibel communicated Blom's excellent score to her superiors and made no mention of "cloned entries" or a failure by Blom to reduce her use of the highest codes.[118]

Third, like other WellStar witnesses' testimony, Heibel's declaration is contradicted by WellStar's internal documents.[119]  Heibel asserts that "we were not aware of reasons to explain why her patients, over several years, would be

---

[113] Dkt. No. 128 at 17.
[114] Dkt. No. 94-33.
[115] *Id.*
[116] Dkt. No. 94-33 at ¶ 4.
[117] Dkt. No. 105-24.
[118] *See* Dkt. No. 105-23.
[119] *Compare* Dkt. No. 94-33 at ¶ 5, *with* Dkt. No. 105-15 at 2.

consistently sicker or in need of more intensive treatment procedures than the

national benchmarks for her practice area or the patients of the other employed

rehabilitation physicians at WellStar, Dr. Nair and Dr. Cotlair."[120]  But Heibel was

not at all confused in September of 2006 when she extolled Blom's virtues to a

colleague after visiting the Cobb Rehab unit: "I know there is constant comparison

between [Dr. Blom's] practice and Nair and Cotlair's but honestly after watching

Cotlair (Nair hasn't been open to it yet) – it's like comparing apples to oranges –

**they practice medicine very differently and as a result their coding patterns**

**reflect that.**"[121]  In addition, Heibel's allegation that Blom was discussed at every

quarterly compliance meeting is contradicted by WellStar's own document,[122] the

failed re-audit list, which does not detail Blom as having *ever* failed a re-audit.[123]

Finally, Heibel attempts to authenticate and provide testimony about matters

to which she lacks personal knowledge and to which she vaguely refers in her

Declaration.  Heibel was obviously not present at some of the meetings for which

she now seeks to submit a declaration – "**[m]y understanding** is that concerns

about Dr. Blom were discussed at every coding compliance meeting in 2006 and

2007.[124]  Heibel also attempts to authenticate and provide testimony about hotline

---

[120] Dkt. No. 94-33 at ¶ 5.
[121] Dkt. No. 105-15 at 2 (emphasis added).
[122] Dkt. No. 94-33 at ¶ 6.
[123] Dkt. No. 105-39.
[124] Dkt. No. 94-33 ¶ 6 (emphasis added).

complaint investigation notes that she did not create.[125]  In addition, she testifies about unidentified documents which "indicated that Dr. Blom likely treated patients both before and after midnight on consecutive days."[126]  Heibel further testifies about other unidentified documentation WellStar supposedly reviewed in investigating other matters about Blom.[127]  But critically, she fails to connect up all of this information to the ultimate issue.  That is, Heibel does not state that, based on all of the facts detailed in her declaration, she advised Anderson that Blom was a compliance risk.  And the reason she does not state that is because it never happened and she did not believe it.

WellStar cannot have it both ways.  Throughout discovery Anderson, testifying as WellStar's 30(b)(6) witness on the reasons for Blom's termination, could not provide substantive testimony about WellStar's conclusion that Blom was a compliance risk, instead constantly punting to WellStar's "coding experts."  Those "coding experts" now swoop in at summary judgment to back fill Anderson's compliance risk conclusion, but Heibel's Declaration is still contradicted by WellStar's documents.  Again, a reasonable juror could determine that these inconsistencies regarding WellStar's proffered reason for termination renders it unworthy of credence.

---

[125] *Id.* at ¶¶ 8-12.
[126] *Id.* at ¶ 13.
[127] *Id.*

>    b)    *WellStar's Documents Clearly Show That Blom*
>           *was Cooperative and Responsive to WellStar's*
>           *Coding Experts.*

The district court concluded that "[i]t is true that Heibel's 2007 email states

that Plaintiff worked well with the compliance staff, but Defendant has proffered

other emails which demonstrate that Plaintiff was resistant to

recommendations."[128] The district court fails, however, to cite the "other emails"

to which it was referring and went on to credit WellStar's position – "[o]ne

instance of demonstrated cooperation does not mean Defendant was wrong in its

determination that Plaintiff did not accept critique well, or more precisely, that

Defendant did not have a 'good faith belief' that Plaintiff was not responding well

to her employer's suggestions."[129] Far from "one instance" of cooperation, the

record is replete with WellStar's documents demonstrating Blom's cooperation

with WellStar's administrators.  First, during the auditing process, Heibel admitted

that "[Blom] is still very friendly and wants me to have access to whatever I

need."[130] After Blom's 29% accuracy report on her first audit in spring 2006,[131]

Blom diligently worked to improve her coding accuracy, and adopted many of

Heibel's and Walker's suggestions.[132] In fact, Heibel confirmed that Blom "has

---

[128] Dkt. No. 128 at 19.

[129] *Id.* at 19-20.

[130] Dkt. No. 105-21.

[131] Dkt. No. 105-1 at ¶ 39.

[132] Dkt. Nos. 105-15, 105-21, 105-23.

been very receptive to all of our observations and suggestions for improvement."[133]

Second, Blom asked multiple follow-up questions to make sure that she was

coding properly.[134]  Lastly, Heibel predicted that she did "not foresee her [Blom]

failing if she continues to focus on the areas we worked on most recently."[135]

Blom not only passed her last audit as Heibel had predicted, but she achieved 96%

accuracy by implementing many of Heibel's suggestions.[136]

    In sum, there are little to no documents supporting Harrison's testimony[137]

during this litigation that Blom was resistant to coaching.  There are no documents

supporting Heibel's[138] or Anderson's testimony[139] that Blom's name was a topic of

discussion in virtually every quarterly compliance meeting.  And even if that

testimony were accurate, WellStar's own documents would compel the opposite

conclusion:  Its coding experts praised Blom's cooperation and improvement in

coding at virtually every turn.[140]

---

[133] Dkt. No. 105-23.
[134] Dkt. No. 105-19.
[135] Dkt. No. 105-23.
[136] Dkt. No. 105-24.
[137] Dkt. No. 94-24 at 23 (dep. pg. 76).
[138] Dkt. No. 94-33 at ¶ 6.
[139] Dkt. No. 94-10 at 18 (dep. pg. 65).
[140] Dkt. Nos. 105-15, 105-21, 105-23.

> **2.     Harrison and Anderson Were Not Genuinely Concerned About the Allegations Raised in the Hotline Complaint.**

The district court concluded that the "crux of Plaintiff's argument - that if the hotline complaint were 'unfounded' – then Defendant had no reason to terminate Plaintiff is simply wrong."[141]  Here, not only does the district court mischaracterize Blom's argument, but it once again confuses a plaintiff's burden on summary judgment.  Again, the focus is on the inconsistencies and implausibilities regarding that proffered reason.  WellStar's position is significantly undermined by the fact that Harrison, after WellStar had completed Rehab Unit staff interviews regarding the hotline call allegations,[142] decided to send Blom a letter which reminded Blom of her obligations and, at the same time, asked her to sign a new employment contract.[143]  The district court cites to the Magistrate Judge's resolution of this issue in WellStar's favor – "when Harrison sent Plaintiff a contract renewal, he did not have the information that he had in March 2008."[144]  The Magistrate Judge, however, did not cite to any record evidence detailing the "information" that Harrison purportedly obtained in March of 2008.[145]  The record contains no evidence that WellStar obtained any new

---

[141] Dkt. No. 128 at 19.
[142] Dkt. No. 105-33.
[143] Dkt. No. 105-34.
[144] Dkt. No. 128 at 12.
[145] *See* Dkt. No. 123 at 29.

28

information or considered further the allegations in the hotline complaint after Harrison's February 29, 2008 letter.

Moreover, Harrison's letter concludes by stating that "[a]ny additional concerns which may arise from the investigation will be addressed with you at a later date."[146] Blom was never informed of "any additional concerns" arising from the investigation.[147] The record clearly demonstrates, however, that WellStar had completed its investigation and had generated a report about its interviews with the Rehab staff by February 25, 2008.[148] Thus, although the record contains no indication that additional concerns were addressed, the Magistrate Judge assumes Harrison obtained additional information in March of 2008.[149] That assumption is not based on record evidence. Therefore, the district court erred in adopting that portion of the Magistrate Judge's Report.

> 3.   *Anderson Did Not Genuinely Believe That Blom Was a Compliance Risk and Behaved in Ways he Believed Were Inconsistent with What WellStar Expected From a Medical Director.*

WellStar conveniently departed from its usual practice of deferring to its experts on coding and compliance issues in trying to justify its decision to terminate Blom. The most powerful rebuttal evidence for WellStar's alleged

---

[146] Dkt. No. 105-34 at 3.

[147] Dkt. No. 105-1 ¶¶ 46-48.

[148] Dkt. No. 105-33.

[149] Dkt. No. 123 at 29.

coding concerns is Heibel's advice to Anderson that if Blom's coding continued to

be of concern, he should convene an external peer review.[150]  Anderson, as

Wellstar's 30(b)(6) witness on the reasons for Blom's termination, testified

repeatedly that they relied on Heibel and her team to advise them on coding and

compliance issues.[151]  Thus, Anderson and Harrison, who are not physicians, were

advised by WellStar's coding experts that if they still had concerns about Blom's

coding they should seek guidance from *other physicians*.[152]   Yet when WellStar's

"coding experts" provided specific advice regarding Blom's coding, that advice

was ignored, and WellStar supposedly decided that coding issues were a proper

reason for terminating Blom.[153]

The district court attempts to explain away this inconsistency by concluding

"simply because Heibel suggested that a peer review would be the next step if

Anderson or Harrison continued to have questions about Plaintiff's coding or

benchmark progress, does not mean that Anderson or Harrison had to follow this

suggestion."[154]  However, the question is not whether Anderson and Harrison were

obligated to follow Heibel's suggestions.  Instead, at the summary judgment stage,

the proper inquiry is whether Anderson's and Harrison's steadfast reliance on the

---

[150] Dkt. No. 105-23.
[151] Dkt. No. 94-10 at 17-19, 22-23 (dep. pgs. 60-61, 64-65, 67-68, 81-82).
[152] Dkt. No. 105-23 (emphasis added).
[153] Dkt. No. 94-10 at 17 (dep. pg. 61).
[154] Dkt. No. 128 at 20.

coding expert's advice for coding and compliance issues, but sudden departure on this issue, constitutes a *weakness, implausibility, inconsistency or contradiction* in that proffered reason for termination.  *See Albert-Aluya,* 470 F. App'x at 851; s*ee also Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1299 (11th Cir. 2006) (citation omitted) (concluding that the employer's deviation from its usual practice was evidence of pretext).  The district court invaded the jury's province by summarily resolving this issue in WellStar's favor, for a reasonable juror could certainly believe that WellStar's conclusion that Blom was a compliance risk, when its coding experts advised that other physicians should make that determination, is unworthy of credence.

As for Anderson's purported belief that Blom did not meet the expectations of her as the Rehab Unit's Medical Director, that allegation is contradicted by Harrison's February 29, 2008 letter.  If in fact Anderson advised Harrison that Blom should be terminated because she behaved in ways inconsistent with that position, and Harrison subsequently relied on that advice in his decision to terminate Blom, he should have addressed that as an "additional concern" that had arisen.  However, he failed to do so.  Moreover, Blom's contract specified her duties,[155] and, when Anderson was asked during his deposition if Blom had

---

[155] See Dkt. Nos. 105-2, 105-3.

violated her contract, Anderson responded that she did not do so.[156]  Therefore, a

reasonable juror could thus conclude that this proffered reason is unworthy of

credence.

### B.    Blom Demonstrated Gender Bias.

#### 1.    Similarly-Situated Physicians.

The district court erred by allowing WellStar's post-hoc rationalizations to

serve as the criteria on which the court evaluated the proffered comparators.  This

approach cannot be squared with this Court's authority that a comparator must be

"similarly situated to the plaintiff in all relevant respects."  *See Rioux*, 520 F.3d at

1280 (internal marks and citation omitted).

Blom has demonstrated that her similarly-situated male counterparts were

treated more favorably.  The documents produced by WellStar show that, like

Blom, numerous WellStar male physicians were accused of the same misconduct:

failed coding audits and general coding concerns.  However, as Anderson

acknowledged during his deposition, none of those male physicians, who have

employment histories that include coding and compliance issues, were terminated

or even disciplined for being a purported compliance risk.[157]  And contrary to the

district court's conclusion that those male comparators were "unnamed,"[158]

---

[156] See Dkt. No. 94-10 at 24 (dep. pgs. 86-88).
[157] Dkt. No. 105-38 at 11-17 (dep. pgs. 42-48).
[158] Dkt. No. 128 at 21.

Anderson testified about a specific list of those male similarly-situated physicians who were not disciplined.[159]  Therefore, the district court erred in concluding that the proffered comparators were not similarly situated.  *See Lathem v. Dep't of Children & Youth Servs.*, 172 F.3d 786, 793 (11th Cir. 1999) (concluding that the district court correctly found that the plaintiff and the comparator were similarly situated because the employer accused them of the same conduct, but retained the comparator and terminated the plaintiff).

### 2.    *Hart's Testimony Regarding Gender Bias.*

Hart's comments regarding WellStar's gender bias are admissible under Federal Rule of Evidence 801(d)(2)(D).  Several weeks before her termination, Hart called Blom and told her that WellStar was targeting her and she was the victim of gender bias.[160]  The district court refused to consider this evidence and adopted that portion of the Magistrate Judge's Report concluding that Blom had failed to lay a foundation for its admissibility.[161]  However, in the *quid pro quo* sexual harassment context, a supervisor relies on his *apparent* or actual authority to extort sexual consideration from an employee.  *See Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311, 1316 (11th Cir. 1989).

---

[159] Dkt. Nos. 105-38 at 11-17 (dep. pgs. 42-48), 105-39, 105-40.
[160] Dkt. No. 105-1 ¶¶ 41-42.
[161] Dkt. No. 128 at 21; *see also* Dkt. No. 123 at 45.

Here, Blom reasonably relied on Hart's apparent authority to influence her

employment conditions in exchange for a sexual relationship.  As for the record

evidence connecting Hart to the terms and conditions of Blom's employment (here

the termination), Blom had not spoken to Hart for two years,[162] so the mere fact

that he called at that particular time demonstrates that he was aware of Blom's

difficulties.  Further, Hart relayed to Blom information indicating that he had

knowledge of her difficulties and warned her of a "plan to terminate" her because

of her gender.[163]  And even though the last communication from Harrison indicated

that Blom would not be terminated (the February 29, 2008 letter),[164] Hart was

actually correct.  Blom was indeed terminated within a few weeks.[165]

Hart has long demonstrated that he was privy to information regarding

Blom's employment with WellStar and that he was able to influence the terms and

conditions of her employment,[166] even after he ceased to be her direct supervisor in

2004.[167]  Blom has consistently testified to that effect.[168]  Even though Hart had not

been her direct supervisor for two (2) years, Hart correctly predicted what would

happen when Blom ended their sexual relationship in 2006 – for the first time in

---

[162] Dkt. No. 105-11 at 24 (dep. pg. 321).

[163] *Id.* at 25 (dep. pg. 322); Dkt. No. 105-1 ¶ 42.

[164] Dkt. No. 105-34.

[165] Dkt. No. 105-9; *see also* Dkt. No. 105-1 ¶ 48.

[166] Dkt. No. 105-1 at ¶ 19.

[167] Dkt. No. 94-25 at 12, 45 (dep. pgs. 33, 163-65).

[168] Dkt. No. 105-11 at 20-21 (dep. pgs. 311-12).

six years, Blom suddenly experienced purported coding problems.[169]  Thus, to the extent she has not yet done so, the record contains ample evidence which would allow Blom to lay a foundation such that Hart's statements could be "reduced to admissible evidence at trial."  *See Macuba v. DeBoer*, 193 F.3d 1316, 132324 (11th Cir. 1999).

## II.    THE DISTRICT COURT ERRED BY GRANTING SUMMARY JUDGMENT ON BLOM'S FMLA RETALIATION CLAIM.

The record contains sufficient evidence to justify sending the FMLA retaliation claim to trial.  While a very close temporal proximity exists between Blom's final complaint to Harrison, one of the decision makers, regarding FMLA leave and her retaliatory termination, she does not rely on this evidence alone.  The record reflects that Blom repeatedly complained about her FMLA leave to the decisions makers, Anderson and Harrison, during the six-week period prior to her final complaint.[170]

As discussed in detail, *supra,* a reasonable juror could easily conclude that WellStar's proffered reasons for Blom's termination are unworthy of credence.  WellStar made a dramatic departure from its usual practices when purportedly terminating Blom because she was a compliance risk, which is further evidence of pretext.  *See Hurlbert*, 439 F.3d at 1299 (concluding that the employer's deviation

---

[169] Dkt. No. 105-1 ¶¶ 30-32.
[170] Dkt. Nos. 105-27, 105-28, 105-29, 105-30, 105-31.

from its usual procedures was evidence of pretext).  WellStar typically deferred to recommendations for all coding and compliance matters provided by its "coding experts," [171] and among those recommendations included an external peer review of Blom's coding if WellStar still had any concerns.[172]  However, in stark contrast to WellStar's usual practice of deferring to its coding expert's recommendations, WellStar did not implement an external peer review before terminating Blom due to its purported concerns about her coding.[173]  Finally, none of the documents created contemporaneously with Blom's termination make any reference to WellStar's manufactured reasons.[174]  *Id.* at 1298-99 (concluding that the employer's failure to reference the issues regarding the employee's job performance or disciplinary status and to identify the reason for the employee's termination in the documents contemporaneous with that termination was evidence of pretext).  Accordingly, Blom met her burden at the summary judgment stage.

## III.  THE DISTRICT COURT ERRED BY GRANTING SUMMARY JUDGMENT ON BLOM'S CLAIM FOR *QUID PRO QUO* SEXUAL HARASSMENT.

In granting summary judgment, the district court focused exclusively on the issue of whether "Hart was involved in Plaintiff's [Blom's] termination."  However, this issue is relevant as to *a* basis—not *the* basis—to establish a causal

---

[171] Dkt. No. 94-10 at 17-19, 22-23 (dep. pgs. 60-61, 64-65, 67-68, 81-82).
[172] Dkt. No. 105-23.
[173] Dkt. No. 105-7 at 4-6 (dep. pgs. 219-221).
[174] Dkt. No. 105-9; Dkt. No. 105-1 ¶ 48.

link between the tangible employment action and the alleged harassment.  *See*

*Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227, 1232 (11th Cir.

2006) ("[T]emporal proximity between the harassment and a tangible employment

action can give rise to a genuine issue of fact as to causation.").  If the district court

had not limited its analysis, it is apparent that a very close temporal proximity

exists between Hart's sexual advances and Blom's termination, which is sufficient

to preclude summary judgment.

Moreover, there is a genuine issue of material fact as to whether Hart had the

ability to influence Blom's termination.  The district court states that, "[t]he only

evidence in the record is the denial of WellStar, Harrison, Anderson, and Hart that

Hart had . . . [the] ability to influence the termination,"[175] but the record reflects

that, in reliance on his apparent authority, Hart indicated that he had the ability to

influence the decision to terminate Blom.[176]  Hart has long demonstrated that he

was privy to information regarding Blom's employment with WellStar and that he

was able to influence the terms and conditions of her employment,[177] even after he

ceased to be her direct supervisor in 2004.[178]  Hart represented to Blom, who

reasonably relied on Hart's apparent authority to influence her employment

conditions, that he could influence the decision to terminate her when he offered to

---

[175] Dkt. No. 128 at 24.
[176] Dkt. No. 105-1 at ¶¶ 43-44.
[177] Dkt. No. 105-1 at ¶ 19.
[178] Dkt. No. 94-25 at 12, 45 (dep. pgs. 33, 163-65).

protect her from termination in exchange for sex.[179]  Because the testimony of

WellStar and its employees diametrically opposes Blom's testimony on this precise

material fact, summary judgment was improper as to Blom's *quid pro quo* sexual

harassment claim.  *See Munoz v. Oceanside Resorts, Inc.*, 223 F.3d 1340, 1345

(11th Cir. 2000) (noting that employee testimony that "directly contradicted" the

employer's testimony on a material fact "creat[ed] a factual conflict properly

resolved by the jury"); *Rosenfield v. Wellington Leisure Prods.*, Inc., 827 F.2d

1493, 1497 (11th Cir. 1987) (noting that the conflicting testimony of the plaintiff

and the defendants' witnesses raised an issue of fact as to the reason for the

plaintiff's termination).

## **CONCLUSION**

For all of the reasons above, Blom respectfully requests that the Court

reverse the district court's grant of summary of judgment as to her claims for Title

VII discrimination, FMLA retaliation, and *quid pro quo* sexual harassment.

---

[179] Dkt. No. 105-1 at ¶¶ 43-4.

This 17th day of June, 2013.

/s/ Von A. DuBose
Edward B. Krugman
Georgia Bar No. 429927
Von A. DuBose
Georgia Bar No. 231451
Samika N. Boyd
Georgia Bar No. 194093
**BONDURANT MIXSON & ELMORE, LLP**
3900 One Atlantic Center
1201 West Peachtree Street, N.W.
Atlanta, Georgia  30309-3417
(404) 881-4100

## CERTIFICATE OF COMPLIANCE

I certify that this Brief complies with the type-volume limitation set forth in Fed. R. App. P. 32(a)(7)(B).  This brief contains 8,003 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and 11th Cir. R. 32-4.

I further certify that his Brief will be promptly uploaded in electronic format to the Court's website, pursuant to 11th Cir. R. 31-5(c).


/s/ Von A. DuBose
Von A. DuBose
Georgia Bar No. 231451

40

## CERTIFICATE OF SERVICE

I certify that I have this day caused a true and correct copy of the foregoing

**BRIEF OF APPELLANT** to be served by electronic mail and United States mail

on the following counsel of record:

Scott G. Blews, Esq.
sblews@taylorenglish.com
Deborah Jayne Livesay, Esq.
dlivesay@taylorenglish.com
Sean R. Smith, Esq.
ssmith@taylorenglish.com
Steven J. Whitehead, Esq.
swhitehead@taylorenglish.com
Taylor English Duma LLP
1600 Parkwood Circle, Suite 400
Atlanta, GA  30339

Lauren House Zeldin, Esq.
lauren.zeldin@ogletreedeakins.com
Ogletree Deakins Nash Smoak & Stewart, P.C.
One Ninety One Peachtree Tower
191 Peachtree Street, N.E., Suite 4800
Atlanta, GA 30303

This 17th day of June 2013.

/s/ Von A. DuBose
Von A. DuBose

41